# Zehner, Appellant, *v.* Shepp.

*Waters—Deposit of coal dirt—Injury to water power—Evidence.*

1. In an action of trespass by a lower riparian owner against an upper riparian owner to recover damages for injuries to the plaintiff's water power alleged to have been caused by the action of the defendant in depositing coal dirt in the stream, the defendant may prove that the plaintiffs in previous suits against defendant's predecessor in title, had testified that the water power had been totally destroyed. Such evidence is admissible to contradict plaintiff's testimony as to the damage which he had sustained by defendant's action, and as bearing upon his credibility.

2. In such an action the evidence bearing upon the deposit of the coal dirt must be confined to events subsequent to the date when the defendants began to operate their property. If the plaintiff offers no evidence to separate with any reasonable certainty the conditions existing at the time the defendants began to operate, and the conditions existing at the time of the trial, and cannot show by any books or accounts a loss in the operation of the mill, he cannot recover more than nominal damages.

Argued Dec. 5, 1912. Appeal, No. 236, Oct. T., 1912, by plaintiff, from judgment of C. P. Schuylkill Co., Sept. T., 1907, No. 141, on verdict for plaintiff in case of Jacob Zehner v. E. M. B. Shepp, C. S. Shindel and James Tonley, trading as Shepp & Co. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Trespass to recover damages for injuries to water power. Before BRUMM, J.

The court gave binding instructions to find for the plaintiff for six cents damages.

Verdict and judgment for plaintiff for six cents. Plaintiff appealed.

*Error assigned* were (1–18) various instructions and rulings on evidence.

*E. D. Smith* and *W. F. Shepherd,* for appellant, cited: Hoober v. New Holland Water Co., 43 Pa. Superior Ct.

262; Hogg v. Water Co., 168 Pa. 456; Wallace v. R. R. Co., 195 Pa. 127.

*Geo. M. Roads*, for appellee, cited: Sipe v. R. R. Co., 219 Pa. 210; Bricker v. Stone Co., 32 Pa. Superior Ct. 283.

OPINION BY ORLADY, J., October 13, 1913:

This action of trespass was brought to recover damages for injuries done by the defendants to the plaintiff's water power and land, by reason of their depositing culm, muck and coal dirt in an upper part of a stream which flowed through the plaintiff's property, and which accumulated in such quantities in the plaintiff's dam and mill race as to seriously interfere with the natural flow of water, and diminish the power formerly had at the mill. The plaintiff acquired title in 1892 to a tract of thirty-two acres of land on which were erected a grist and sawmill. In 1905, the defendants began washing coal at their mining operation higher up the stream and the damages claimed in this action are alleged to have been caused by the excessive amount of debris they discharged into the stream. The trial in the court below extended through eleven days and the record exhibits 750 pages of testimony. There are nineteen assignments of error presented, thirteen of which are to answers to points submitted for charge, four to the charge of the court in whole or in part, and to the admission to evidence.

It appears by the record that the prior owners of this property received as damages for permanent injury to the water power of this grist and sawmill, under an award against the Lehigh Coal & Navigation Company, the sum of $18,000, and costs, which was paid November 16, 1898, and further, that in an action begun December 23, 1898, in which the declaration claimed the destruction of the property of which the land described in this case was a part for the same causes,

another recovery of $5,000 was had against the Silver Brook Coal Company, the judgment being entered on October 13, 1903, and subsequently paid. The summons in the present action issued July 27, 1907, and the statement avers that the coal dirt, fine coal, culm and muck which these defendants wrongfully deposited in the Little Schuylkill river, etc., has greatly injured and destroyed the plaintiff's land, etc. The records of these earlier suits were received in evidence as tending to show that Jacob Zehner, a witness in this case and one of the plaintiffs in an earlier one for the same cause of action, had testified that the water power of this mill had been entirely destroyed by the debris deposited in the stream by the earlier trespassers, and for the purpose of contradicting him, and affecting his credibility as a witness in the present trial as to the fixing the amount of damage done to the property by these defendants. These records were important elements to be considered, and the testimony of the witness Jacob Zehner, which covered over forty pages of the printed record, is the most important in the case. His former testimony and that given on the present trial, the allegation of a total destruction of the water power by two earlier trespassers, and a recovery had therefore by substantially the same plaintiffs, were properly for the consideration of the jury when a third injury to the same premises was made the basis of the claim. The contradiction of this witness affected his credibility in determining the amount of damage he asserted were the result of the accretion of the debris since the last judgment had been obtained for the cause of action asserted in that case.

The uncontradicted testimony was that the present defendants began operating the colliery of which the plaintiff complains in October, 1905, so that the evidence was rightly confined to events subsequent to that date. The confusion of dates, of ownership of the property, and former trespassers made it very difficult to clearly

define the injuries that were directly caused by these
defendants. This was apparent to court and counsel,
as shown by the following inquiry, put by the court
on the third day of the trial to plaintiff's counsel, "Let
the attorneys for the plaintiff state how they propose to
establish the measure of their loss outside the loss by
reason of the permanent damage to the land; that is,
outside of the loss by reason of the difference in the
value of the land with this muck on, and the value if
it were off. Will you be kind enough to answer that?
I want that for a matter of record. In other words,
what they have termed temporary damages as contra-
distinguished from permanent damages." This request
was complied with and certain elements of damage were
specified and the replacing of the roller system with a sieve
system, installing a new gasoline engine in the sawmill,
placing of two new turbine wheels in the gristmill, were
suggested for the temporary losses. The evidence in sup-
port of these claims was so confusing and uncertain that
the court again stated, "You are claiming loss upon two
premises; one loss to the realty, and that you call per-
manent damages; the other the loss to the personalty, and
that you call temporary damages, you now have the two
mixed."

It appears that the dam was 1,500 feet in length,
128 feet wide at the breast, sixty feet wide at its head
and six feet in depth. The plaintiff was asked, "Have
you made an estimate based on the actual cost of clean-
ing out the dam? Have you figured upon the quantity
of dirt that is in the dam?" and replied, "I cannot make
an estimate, I cannot figure it out." And again, "From
the condition of things there, the amount that is in
there, and the coal dirt that is in the race and in the
dam and is coming in as you have stated, can you re-
move that dirt from there so as to run the mill?" and
answered, "We can remove it so much that we can run
the mill, we cannot run the mill over two days no time."
"Q. Can you tell us the condition of the bottom of the

dam in 1902? A. There was coal dirt there, but not filled up as it is now. Cannot tell what the condition of the bottom was then." It was conceded that these defendants were not liable for the culm and dirt that had been deposited in the dam prior to 1905, and there was no attempt to show even approximately the extent of the particular deposit since that date. The plaintiff claimed that it was impractical to clear the dam of the culm and waste which amounted to 26,000 cubic yards, and it would cost twenty cents per cubic yard to remove it or $5,222, and to clear the race it would cost $346.50. These estimates were based on conditions that existed at the time of the trial, but there was no testimony to separate the debris that had accumulated in the race and dam since 1905 from that that was in them at that date. The uncertainty and indefiniteness in regard to the amount of culm and coal dirt in the race and dam and the time when it had been deposited there, made the ascertainment of the cost of the removal of that for which these defendants were responsible a mere guess, and nothing more. It was but a reasonable contention to urge that before the defendants were fixed with any liability, the exact condition of the premises should be clearly shown as of 1905, when their mining operations begun. It was conceded that the mill was in a crippled condition in 1902 by reason of the culm deposits, and the evidence should be reasonably exact and clear in showing to what extent the defendants' alleged torts were responsible for the conditions existing at the time of trial. We have searched in vain for any evidence to separate with any reasonable certainty the conditions existing in 1905, and in 1911, the time of the trial. And, in regard to the claim for temporary damages as they were called, we find the testimony so obscure and contradictory that it is not possible to arrive at even an approximate amount of damages. In regard to the "toll" lost by reason of the change in operation of the mill, there were no books, memoranda or accounts kept ex-

cept as to credit transactions. The time of operating the mill was unknown even to the plaintiff, nor did he know the amount of grain ground at the mill or the amount he sold as a merchant to the general trade. The measure of damages as claimed by the plaintiff was not only indefinite but purely speculative: Bricker v. Stone Co., 32 Pa. Superior Ct. 283. There was no loss shown by way of even gross profit. How was it possible for a jury to reasonably determine an amount when the plaintiff admitted he could not fix one from his own accounts.

The loss claimed on account of substituting the sieve system for the roller process could not be considered by this jury, when this change was admittedly made in the mill several years prior to these defendants operating the colliery. The gas engine was installed in 1908, but as the plaintiff testified it was to furnish power to a sawmill that had been standing idle from causes which existed prior to 1902, and the necessity for its installation existed years before the defendants operated their plant.

The cause of the erosion of the turbine wheels, the necessity for purchase of new ones, their value and the value of the old ones, even if separated from the item of permanent injury to the land was largely conjectural.

The permanent damages claimed were for the value of five acres of the farm, and as he modified his claim on the trial by claiming all damages as permanent in character, they were impossible of ascertainment for the reason that there was no reasonable separation of the causes and conditions that existed when the defendants started their colliery. It is but proper to add that every opportunity was given the plaintiff through suggestions of the trial judge to specify in an intelligible way the actual damage claimed and assign the causes for them.

The plaintiff's fifth point was as follows: "In an action to recover damages for the pollution of a stream by coal dirt, the measure of damages is the cost of removing

the coal dirt, unless the expense of the removal of the coal dirt exceeds the value of the entire property, in which case the value of the property is the limit of the measure of damages, and in no event can there be a recovery in excess of the value of the entire property for the permanent injury." To which the trial judge answered, "Right at this point, we say to you that this is the law, without a question, and it confirms the position taken by the court, and sustains it when it says that in no event can there be a recovery in excess of the value of the entire property for permanent injury," and further, "It is impossible for this jury to state how much that property had depreciated, when there is no evidence before it to show what it was worth at the time that it was shown that these defendants helped to depreciate it, if they did."

The plaintiff made out a technical case of trespass but nothing more; having failed to furnish proof of any special damage incident to this action he must be content with nominal damages. The assignments of error are overruled and the judgment is affirmed.